N. RISLEY & SONS, PLAINTIFFS, AND DEFENDANTS IN
ERROR, v. OCEAN CITY DEVELOPMENT COMPANY, DE-
FENDANTS, AND PLAINTIFFS IN ERROR.

Argued December 3, 1907—Decided March 13, 1908.

1. A witness who had for twenty years filled a chair of civil engi-
neering, and afterward had made a special study of jetties and
bulkheads, was, in the discretion of a trial judge, properly per-
mitted to express an opinion upon the question whether a bulk-
head with a filling of sand behind it or a bulkhead without such
filling was the more likely to resist ocean storms.

2. It is within the discretion of a trial judge to either permit or pro-
hibit the cross-examination of a witness, who is also a party to
the suit, concerning a matter aside from the scope of the examina-
tion in chief.

3. A contract to fill in sand behind a bulkhead for a real estate com-
pany contained a clause that the work of filling should, until final
payment and acceptance by the company, remain at the sole risk
and expense of the contractor. An ocean storm washed away the
bulkhead and a part of the filling before the completion of the
work. *Held*, (1) that the risk imposed upon the contractor by
the terms of the contract did not include any loss resulting from
a breach of duty by the company, and it appearing that the bulk-
head against which the filling was to be placed was to be built by
the company. *Held*, (2) that if the loss of the filling occurred by
the fault of the company in erecting such bulkhead, the risk was
not covered by the clause in the contract.

This writ brings up a judgment entered on a verdict re-
turned on a trial of a Supreme Court issue at the Atlantic
Circuit.

For the plaintiffs in error, *Bourgeois & Sooy.*

For the defendants in error, *Thompson & Cole.*

The opinion of the court was delivered by

REED, J. This action was brought to recover the amount
claimed by the defendant under a contract entered into on
April 1st, 1903, by the plaintiffs with the Ocean City De-
velopment Company, the defendants.

The work to be done under this contract was to furnish all material and labor for the fill of the property of defendant between the curb line and bulkhead line on Wesley avenue, between Forty-ninth and Fiftieth streets, and between a centre line of Forty-ninth street and centre line of Forty-seventh street, from the bulkhead on Wesley avenue to the right of way of the West Jersey and Seashore Railroad Company, and between Fiftieth and Forty-seventh streets, from the right of way of the West Jersey and Seashore Railroad Company to the right of way of the Ocean City Railroad Company. The filling was to be paid for at the rate of thirteen and one-half cents per cubic yard for fill. The amount of cubic yards was fixed by contract to be one hundred and twenty thousand nine hundred and six. The plaintiffs were to be allowed an additional $1,000 for all filling made necessary by settling of the work covered by the contract.

On the trial the plaintiffs proved the contract, and proved that they had dumped in filling amounting to about one hundred and four thousand nine hundred and sixteen cubic yards. They admitted that they had been paid $8,288.74, leaving unpaid the claim balance of $6,874.92, which included the charge of $1,000 for the settling.

It appears that a portion of this one hundred and four thousand nine hundred and sixteen cubic yards had been washed out by a storm occurring in October, 1903, which broke the bulkhead against which the sand, or a portion of it, had been filled. The plaintiffs claim the right to be compensated for the sand so swept away on the ground that the defendants were under engagement to build a suitable bulkhead to keep the sand in place, and that the defendants failed to do this, and by reason of their fault, some fourteen thousand cubic yards of sand already put in place by the plaintiffs was lost as filling.

The defendants, on the other hand, claimed that the washing away of the bulkhead was the fault of the plaintiffs, and the fault consisted in the plaintiffs' failure to fill in behind the bulkhead as it was being constructed, and so failed to

provide a support against the storms and waves which swept the bulkhead away.

The defendants not only resisted payment for the sand thus washed away, but also claimed by recoupment damages for the loss of the bulkhead and for the loss of the gravel occasioned by the inundation resulting from the demolition of the bulkhead.

A great number of assignments of error are directed to the ruling of the trial judge concerning the admission or rejection of testimony offered to show the character of the bulkhead erected by the plaintiffs, and to show the effect of the sand filling behind the bulkhead as a support for the structure against the assault of the ocean storms. Many of those assignments were not pursued upon the argument, and only those now pressed as a ground for reversal will be considered.

The first of these is the fourth assignment, asserting that it was error to permit one Lewis M. Haupt to testify as an expert. His testimony was directed to the point whether the bulkhead was more or less likely to be injured by ocean storms if protected by something back of it on the landward side. His examination as to competency to testify as an expert showed that he had occupied the chair of civil engineering in the University of Pennsylvania for twenty years; that since 1892 he had been consulting engineer, and had made a special study of the building of bulkheads. His examination as to the specific work done by him exhibited sufficient expert knowledge on the matters under consideration to justify the trial court in admitting his testimony. The objection principally raised against his equipment as an expert is that he admitted that he did not consider himself an expert, but the reference to the printed book where this admission is said to have been made does not bear out the statement that the witness so testified, for the witness, according to the printed book, said: "I *do* consider myself as an expert to give an opinion with regard to bulkhead, jetty and wharf construction generally." (Printed Book, page 78, line 15.) However, if the facts exhibited that his study and experience were such as to qualify him as one possessed of special knowledge on the

subject of bulkhead construction, it would matter little what his own opinion of his qualifications might be. Modesty might deprecate his posing as an expert, while his qualification as such clearly appeared.

It is also assigned for error that this witness was permitted to answer whether he knew any case where the effect of the water coming over the bulkhead and falling on the earth behind it had caused the breaking up of the bulkhead, and it is again assigned that he was permitted to answer the question, "If you know of a case that is in point with this case, where there has been such a result as you started to state, I wish you would give such a case, if you know of it personally." The objection to these questions was, not that it raised an issue upon a collateral matter (2 *Ell. Ev.*, § 1123), but the objection was that there was nothing to show that there was any similarity between the supposed case and the case in question.

The point of similarity was that in both instances there was a bulkhead with earth behind the bulkhead, and waves striking the bulkhead in front. The conditions were sufficiently alike to cast light upon the point of inquiry at that stage of the examination, which inquiry was whether waves, striking the bulkhead in front, would leap the bulkhead, fall upon the earth behind, and wash the bulkhead away.

The assignments of error based upon both these questions are unsubstantial.

The tenth assignment attacks the admission of the testimony of the plaintiffs on the point whether the defendants had sold lots since the plaintiffs quit work. The question was asked to show that the plaintiffs had used the property, and so accepted the land, although the filling was not completed. The purpose, as stated at the trial, was to forestall any objection that there could be no recovery under the contract until there was completed performance. There seems to have been no use made of this testimony, and there was no injurious error in admitting it.

The twelfth assignment challenges the admission of the answer to the following question:

"*Q*. In that same storm, were there any houses washed down ?

"*A*. Yes, sir.

"*Q*. Anywhere near this ?

"*A*. Yes, sir; there were two houses washed down at Fifty-sixth street, and one between Fifty-fifth and Fifty-sixth streets."

The witness was being examined as to the severity of the storm on October 9th and 11th, which storm washed away the bulkhead and the sand in question. To show the character of the storm, the witness testified that within five blocks of the *locus in quo* three houses were washed away. The objection to this testimony at the trial was that it was immaterial and irrelevant. The objection now raised is that nothing appears to show the condition of the houses or the condition of the shore at the point where the disaster occurred. These conditions could have been shown on the cross-examination and upon the examination-in-chief. We think the questions were neither immaterial nor irrelevant.

The sixteenth assignment concerns the overruling of this question: "*Q*. Mr. Risley, Mr. Sutton testifies that he said that he was to put sand back there, and that he did put the sand there; do you say that he didn't put it there?" And again: "*Q*. Do you know whether or not Mr. Sutton did put the sand there?"

Mr. Sutton had built for the development company the bulkhead against which the sand was to be dumped. Risley, one of the plaintiffs, had testified that he was on the ground when Sutton was building the bulkhead, and had said to Sutton, "You certainly do not expect us to dump against this bulkhead, do you?" and that Sutton had said, "No; he was going to haul sand in there." Then, on the cross-examination of Risley, came the question overruled. It was overruled as not within the scope of the examination-in-chief, which the trial judge said was confined to the conversation between the witness and Sutton. This position of the court was not controverted, but the right to examine Risley was put upon the ground that matters aside from those touched upon in the

examination-in-chief were proper because the witness was a party plaintiff.

It is true that the fact that a witness is also a party will, in civil causes, confer upon the trial court a discretion to permit a cross-examination of such witness to take a range outside of the strict limits of the examination-in-chief. This however, is a rule of discretion, and we know of no cases in which it has been held to be error for the trial judge to limit the cross-examination to matters dealt with in the examination-in-chief, although the witness is a party.

The seventeenth and eighteenth assignments rest upon the same ground as the sixteenth assignment, namely, the right to cross-examine a witness who is a party upon every matter which is relevant to the party's case without regard to the scope of his examination-in-chief, and, for the same reason, the position of the plaintiffs in error is untenable.

The nineteenth assignment deals with the overruling of a question very similar to those just mentioned. The question was to Risley:

"*Q.* After you had the conversation with Mr. Sutton, which you have just related, did you or your firm begin the filling in of the sand back of the bulkhead?"

This was objected to as not cross-examination. The reply of counsel for the defendants to this objection was: "He is one of the parties. I have a perfect right when a plaintiff is on the stand to examine that person to any extent in cross-examination. I cannot be put to the position of making the plaintiff my own witness."

So, it is perceived that it was assumed by the parties and the court that the admissibility of the question rested, not upon whether it was within the scope of the examination-in-chief, but whether the defendant had the right to examine in all matters which would have been relevant had he himself called Risley as a witness. The question was probably admissible as cross-examination, whether Risley was a party or not, but the court was misled by the position of the counsel respecting the ground of its admissibility, and there was

no error in refusing to admit the question upon the ground stated.

The same may be said of the twentieth assignment of error attacking the overruling of another question.

The twenty-third assignment attacks the admission over objection of an answer to a question propounded to Norris Ingersol. The question was this: "Did the weakness of the bulkhead that you saw interfere with your continuously filling back of it?" The answer was: "Yes; they slacked up on it." The witness had already testified that he had observed that the bulkhead was squashing out at the time near the corner. The witness said he should judge thirty or forty feet of the bulkhead had sprung out; that it did not seem to be very strong anywhere along it, and it was out and in all the way down. Then came the question whether this weakness, namely, this condition of which he had already testified, interfered with their work of filling behind the bulkhead. It seems manifest that after the witness had testified to the condition of the bulkhead, he could testify to the fact that this condition caused them to actually slack up in the work of filling at that point. It was not a conclusion, but a statement that, because of this condition already disclosed, the defendants had as a fact slacked up in the work.

The twenty-fourth assignment avers an error in permitting the following question: "Mr. Risley, who was it that started to build the retaining wall around this property?" In connection with this assignment are the twenty-fifth and twenty-sixth assignments, which are directed to the permission of questions concerning conversations with the officers of the defendants relative to the building of the retaining wall. The fault in permitting any of these questions to be answered is alleged to be that the contract is the only test as to whether the plaintiffs were to build this retaining wall. The contract is entirely silent respecting the building of any retaining wall. The question, however, was not "Who was bound to build the retaining wall, but who undertook to build it." If the defendants voluntarily undertook to build it, and by a delay in doing it caused a delay in the work of the plaintiffs, it would

not matter whether defendants were, or were not, bound to do it under the contract. In this view the questions were not objectionable.

The remainder of the assignments are directed to the charge of the court.

The twenty-seventh assignment challenges this extract from the charge: "You will have to determine whether the plaintiffs were responsible for the washing away of this bulkhead and the consequent loss of sand." The criticism is that the trial court, by this charge, left to the jury the construction of the contract under which the work was done.

If by the terms of the contract the defendants were not bound to pay for the sand which was not in place, although it had been deposited and then carried away, then the charge was erroneous. The contract contains the following clause: "The contractor agrees that all the construction covered by this contract shall, until final payment and acceptance by the company, remain at the sole risk and expense of the contractor." Upon this clause the defendants relied to sustain their contention that the risk of the wash-out was upon the plaintiffs until the work was entirely completed, or was accepted by the company.

The risks imposed upon the contractor undoubtedly included such catastrophes as those over which the plaintiffs had no control—such, for instance, as extraordinary storms or earthquakes, and included risks concerning which there was no duty resting upon the plaintiffs, but no one would imagine that the loss of sand caused by the willful act of the defendants would still be at the risk of the plaintiffs. Nor can it be conceded that if the loss occurred through a negligent act of the defendants, by a breach of some duty imposed upon the defendants to defend or preserve the sand, they could, nevertheless, invoke this clause of the contract.

Now, it will be observed that it was an uncontested assumption on the trial that in the execution of the work contracted for, the development company was to build the bulkhead. While it is true that in the contract there is no express obligation placed upon the company to do this, yet it is

obvious that the presence of a bulkhead to be filled against was assumed by the description of the place to be filled, namely, from the bulkhead line on Wesley avenue. It is at once perceived that it was impossible to fill to the required depth up to the bulkhead line without flowing over the line, unless there was something to support the sand at this point. It is not contested that this something was the bulkhead itself, nor that this barrier was to be placed on the line by the defendants, and that it was so placed by the defendants. The parol testimony of both parties displays this understanding, and it was undoubtedly with this unchallenged testimony in view that the trial judge said that under the contract the defendants themselves were to put up the bulkhead, and that it was to be constructed at their expense, and the plaintiffs were simply to fill in the sand. This part of the charge was not questioned.

Assuming the existence of the duty imposed upon the defendants to build the bulkhead, the purpose of that structure is manifest—it was to confine the sand within the area to be filled. It is common knowledge that without the interposition of such a barrier, the newly-filled soil would be transported by the first high or storm tide that reached it. It is equally obvious that a barrier erected to accomplish the purpose of a bulkhead requires that it should be constructed with materials and in a manner which experience had taught to be the best calculated to master the effect of the waves which menace the shore. When it appeared, therefore, that this duty to erect such a structure was undertaken by the defendants in connection with this work, it was clearly a breach of that duty for the defendants to execute that work in an inefficient and negligent manner. If, by reason of such dereliction of duty, the natural result was the shifting of the sand from the site where it was placed under the terms of the contract, to some other locality, the defendants are not in position to say that this was a risk covered by the clause of the contract already mentioned.

When the court left to the jury to say whether the defendants were responsible, namely, responsible by reason of the

defective construction of the bulkhead, and for the consequent washing away of the bulkhead and the loss of the sand, the court impliedly construed the contract as imposing a duty to properly build the bulkhead, and left the manner of its execution to the consideration of the jury, and, we think, properly.

In respect to that part of the charge challenged by the twenty-eighth assignment, it is to be remarked that the defendants had insisted that the catastrophe was caused by the failure of the plaintiffs to fill in behind the bulkhead, and that it was not caused by the defective construction of the bulkhead itself. In view of this insistence, the trial court charged: "If the defendants themselves delayed the construction of the bulkhead so that the plaintiffs had not an opportunity to fill it in time to avoid the storm, and if without the filling of the sand in back of it you believe the bulkhead would have succumbed to the storm, then the plaintiffs are not responsible, and cannot be charged with the loss of the sand." The other portion of this part of the charge was: "If the defendants by their agent, Sutton, constructed a bulkhead of such character that it would not withstand the storm, the plaintiffs are not responsible."

The criticism of counsel for the defendants is, not that this charge placed upon the defendants the character of insurers of a bulkhead which would be efficacious in resisting all storms, but it is put upon the ground—*first,* that the plaintiffs are estopped by their act in putting sand against this structure, without objection to its condition, which was obvious to them, and *secondly,* because the judge submitted to the jury the question of the kind of bulkhead defendant was to build without regard to the provisions of the contract. The contract, however, provides for no specific kind of bulkhead.

In the absence of any specific request to charge the point now urged, or any specific objection to the charge grounded upon the points now urged, the questions were sufficiently submitted to the jury in the general form employed by the trial judge.

The twenty-ninth assignment is directed to the court's

leaving to the jury whether the fourteen thousand cubic yards should be deducted or not, and this assignment seems to be covered by what has already been said.

The thirtieth assignment is directed to the refusal to charge three separate requests. The first request was that the court charge that the work was at the risk of the plaintiffs until completed, and that the plaintiffs could not recover for more sand than was dumped in as shown by the final estimate of the engineer, which was ninety-five thousand five hundred and fifteen cubic yards.

The question of risks has been already treated, and the conclusions arrived at that any fault of the defendants in completing the bulkhead, which fault led to the loss of the sand, was not a risk assumed by the plaintiffs.

The second request was to charge that the plaintiffs, not having completed the work by September 20th, 1903—the date limit in the contract—they were liable for all damages arising after that date.

Assuming, without deciding, that if it had conclusively appeared that the delay had not been caused by any fault of the defendants, the request should have been charged, yet the refusal was proper. The testimony in the case left it a question for the jury whether the delay in completing the contract before September 20th, 1903, was attributable to the delay of the defendants in building the bulkhead, or in building it in an insufficient manner. The court could not say, as a matter of law, that the plaintiffs were liable for all damages arising after September 20th, 1903.

The third request was that the court should charge that if the bulkhead and work were destroyed by reason of the plaintiffs' failure to fulfill their contract, then the damages would include the value of such work and the cost of rebuilding a bulkhead similar to the one destroyed.

This measure of damages was substantially charged, but inasmuch as the jury did not find the plaintiffs were in fault, the jury was not called upon to apply any rule for measuring damages against them.

Our conclusion is that the judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GAR-RISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, BO-GERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J.   14.

*For reversal*—None.